Approved: _Daniel Nessim_
          DANIEL G. NESSIM
          NI QIAN         **18 MAG 9530**
          DANIEL C. RICHENTHAL
          Assistant United States Attorneys

Before:   THE HONORABLE ROBERT W. LEHRBURGER
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - -   x
                            :
UNITED STATES OF AMERICA       :    **SEALED COMPLAINT**
                            :
    - v. -                 :    Violations of 18 U.S.C.
                            :    §§ 286, 1349, and
ARIEL JIMENEZ,               :    1028A; and 26 U.S.C.
   a/k/a "Melo,"            :    § 7206(1)
IRELINE NUNEZ,               :
ANA YESSENIA JIMENEZ,        :    COUNTY OF OFFENSE:
EVELIN JIMENEZ,             :    BRONX
LEYVI CASTILLO,             :
CINTHIA FEDERO,             :
GUILLERMO ARIAS MONCION,      :
MARCOS DE JESUS PANTALEON,    :
   a/k/a "Junior," and      :
JOSE CASTILLO,              :
   a/k/a "Jairo,"          :

             Defendants.
- - - - - - - - - - - - - - - - -   x

SOUTHERN DISTRICT OF NEW YORK, ss.:

    KAREN FLANAGAN, being duly sworn, deposes and says that she is a Special Agent with the Internal Revenue Service-Criminal Investigation ("IRS-CI"), and charges as follows:

### COUNT ONE
(Conspiracy to Defraud the United States with Respect to Claims)

    1.   From at least in or about 2009 up to and including in or about 2015, in the Southern District of New York and elsewhere, ARIEL JIMENEZ, a/k/a "Melo," IRELINE NUNEZ, ANA YESSENIA JIMENEZ, EVELIN JIMENEZ, LEYVI CASTILLO, CINTHIA FEDERO, GUILLERMO ARIAS MONCION, MARCOS DE JESUS PANTALEON, a/k/a "Junior," and JOSE CASTILLO, a/k/a "Jairo," the defendants, and

others known and unknown, knowingly entered into an agreement, combination, and conspiracy with others and each other to defraud the United States and a department and agency thereof, to wit, the Internal Revenue Service ("IRS"), by obtaining and aiding to obtain the payment and allowance of false, fictitious, and fraudulent claims, to wit, the defendants agreed to prepare and file, and assist others to prepare and file, federal income tax returns fraudulently claiming one or more tax credits, including the Earned Income Tax Credit ("EITC").

(Title 18, United States Code, Section 286.)

## COUNT TWO
(Conspiracy to Defraud the United States with Respect to Claims)

2. From at least in or about 2013 up to and including the present, in the Southern District of New York and elsewhere, GUILLERMO ARIAS MONCION, MARCOS DE JESUS PANTALEON, a/k/a "Junior," and JOSE CASTILLO, a/k/a "Jairo," the defendants, and others known and unknown, knowingly entered into an agreement, combination, and conspiracy with others and each other to defraud the United States and a department and agency thereof, to wit, the IRS, by obtaining and aiding to obtain the payment and allowance of false, fictitious, and fraudulent claims, to wit, the defendants agreed to prepare and file, and assist others to prepare and file, federal income tax returns fraudulently claiming one or more tax credits, including the EITC.

(Title 18, United States Code, Section 286.)

## COUNT THREE
(Conspiracy to Defraud the United States with Respect to Claims)

3. From at least in or about August 2014 up to and including in or about 2015, in the Southern District of New York and elsewhere, JOSE CASTILLO, the defendant, and others known and unknown, knowingly entered into an agreement, combination, and conspiracy with others and each other to defraud the United States and a department and agency thereof, to wit, the IRS, by obtaining and aiding to obtain the payment and allowance of false, fictitious, and fraudulent claims, to wit, the defendant agreed to prepare and file, and assist others to prepare and file, federal tax returns fraudulently claiming one or more tax credits, including the EITC.

(Title 18, United States Code, Section 286.)

2

## COUNT FOUR

(Conspiracy to Commit Wire Fraud)

4.     From at least in or about 2009 up to and including in or about 2015, in the Southern District of New York and elsewhere, ARIEL JIMENEZ, a/k/a "Melo," IRELINE NUNEZ, ANA YESSENIA JIMENEZ, EVELIN JIMENEZ, LEYVI CASTILLO, CINTHIA FEDERO, GUILLERMO ARIAS MONCION, MARCOS DE JESUS PANTALEON, a/k/a "Junior," and JOSE CASTILLO, a/k/a "Jairo," the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other, to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

5.     It was a part and an object of the conspiracy that ARIEL JIMENEZ, a/k/a "Melo," IRELINE NUNEZ, ANA YESSENIA JIMENEZ, EVELIN JIMENEZ, LEYVI CASTILLO, CINTHIA FEDERO, GUILLERMO ARIAS MONCION, MARCOS DE JESUS PANTALEON, a/k/a "Junior," and JOSE CASTILLO, a/k/a "Jairo," the defendants, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

## COUNT FIVE

(Conspiracy to Commit Wire Fraud)

6.     From at least in or about 2013 up to and including the present, in the Southern District of New York and elsewhere, GUILLERMO ARIAS MONCION, MARCOS DE JESUS PANTALEON, a/k/a "Junior," and JOSE CASTILLO, a/k/a "Jairo," the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other, to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

7.     It was a part and an object of the conspiracy that GUILLERMO ARIAS MONCION, JOSE CASTILLO, a/k/a "Jairo," and MARCOS DE JESUS PANTALEON, a/k/a "Junior," the defendants, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by

3

means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

## COUNT SIX
(Conspiracy to Commit Wire Fraud)

8.   From at least in or about August 2014 up to and including in or about 2015, in the Southern District of New York and elsewhere, JOSE CASTILLO, a/k/a "Jairo," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other, to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

9.   It was a part and an object of the conspiracy that JOSE CASTILLO, a/k/a "Jairo," the defendant, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

## COUNT SEVEN
(Aggravated Identity Theft)

10.   From at least in or about 2009 up to and including the present, in the Southern District of New York and elsewhere, ARIEL JIMENEZ, a/k/a "Melo," IRELINE NUNEZ, ANA YESSENIA JIMENEZ, EVELIN JIMENEZ, LEYVI CASTILLO, CINTHIA FEDERO, GUILLERMO ARIAS MONCION, MARCOS DE JESUS PANTALEON, a/k/a "Junior," and JOSE CASTILLO, a/k/a "Jairo," the defendants, willfully and knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Section 1028A(c), to wit, the defendants used and assisted others to use the names and personal identifying information, including Social Security Numbers

4

("SSN"), of other persons during and in relation to the offenses charged in Counts Four, Five, and Six of this Complaint.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b) and 2.)

### COUNTS EIGHT THROUGH ELEVEN
(Subscribing to a False Return)
(as to GUILLERMO ARIAS MONCION)

11. On or about the dates set forth below, in the Southern District of New York and elsewhere, GUILLERMO ARIAS MONCION, the defendant, willfully and knowingly made and subscribed to a U.S. Individual Income Tax Return, Form 1040, for the tax years set forth below, which return contained and was verified by the written declaration of MONCION that it was made under penalties of perjury, and which return MONCION did not believe to be true and correct as to every material matter, in that MONCION falsely stated that he had at least one dependent for whom he could claim a tax credit, whereas, as MONCION then and there well knew, he did not have the listed dependents, as detailed below:

| Count | Tax Year | Approximate Filing Date of Return | Initials of Dependent(s) |
|-------|----------|-----------------------------------|--------------------------|
| Eight | 2013 | March 10, 2014 | N.R.A. |
| Nine | 2014 | March 23, 2015 | D.A. |
| Ten | 2015 | April 26, 2016 | A.B.U. and A.B-U |
| Eleven | 2016 | April 24, 2017 | A.B.U. and A.B-U |

(Title 26, United States Code, Section 7206(1).)

### COUNT TWELVE
(Subscribing to a False Return)
(as to JOSE CASTILLO)

12. On or about the date set forth below, in the Southern District of New York and elsewhere, JOSE CASTILLO, a/k/a "Jairo," the defendant, willfully and knowingly made and subscribed to a U.S. Individual Income Tax Return, Form 1040, for the tax year set forth below, which return contained and was verified by the written declaration of CASTILLO that it was made under penalties of perjury, and which return CASTILLO did not believe to be true and correct as to every material matter, in that CASTILLO falsely stated that he had at least one dependent

5

for whom he could claim a tax credit, whereas, as CASTILLO then and there well knew, he did not have the listed dependent, as detailed below:

| Count | Tax Year | Approximate Filing Date of Return | Initials of Dependent |
|-------|----------|-----------------------------------|-----------------------|
| Twelve | 2013 | March 3, 2014 | M.H. |

(Title 26, United States Code, Section 7206(1).)

### COUNT THIRTEEN
(Subscribing to a False Return)
(as to LEYVI CASTILLO)

13.  On or about the date set forth below, in the Southern District of New York and elsewhere, LEYVI CASTILLO, the defendant, willfully and knowingly made and subscribed to a U.S. Individual Income Tax Return, Form 1040, for the tax year set forth below, which return contained and was verified by the written declaration of CASTILLO that it was made under penalties of perjury, and which return CASTILLO did not believe to be true and correct as to every material matter, in that CASTILLO falsely stated that he had at least one dependent for whom he could claim a tax credit, whereas, as CASTILLO then and there well knew, he did not have the listed dependent, as detailed below:

| Count | Tax Year | Approximate Filing Date of Return | Initials of Dependent |
|-------|----------|-----------------------------------|-----------------------|
| Thirteen | 2012 | February 25, 2013 | S.C. |

(Title 26, United States Code, Section 7206(1).)

## COUNTS FOURTEEN AND FIFTEEN

(Subscribing to a False Return)
(as to CINTHIA FEDERO)

14.   On or about the dates set forth below, in the
Southern District of New York and elsewhere, CINTHIA FEDERO, the
defendant, willfully and knowingly made and subscribed to a U.S.
Individual Income Tax Return, Form 1040, for the tax years set
forth below, which return contained and was verified by the written
declaration of FEDERO that it was made under penalties of perjury,
and which return FEDERO did not believe to be true and correct as
to every material matter, in that FEDERO falsely stated that she
had at least one dependent for whom she could claim a tax credit,
whereas, as FEDERO then and there well knew, she did not have the
listed dependents, as detailed below:

| Count | Tax Year | Approximate Filing Date of Return | Initials of Dependents |
|-------|----------|-----------------------------------|------------------------|
| Fourteen | 2012 | March 4, 2013 | M.H. and E.J.A. |
| Fifteen | 2013 | March 10, 2014 | N.M.R. and E.P. |

(Title 26, United States Code, Section 7206(1).)

## COUNT SIXTEEN

(Subscribing to a False Return)
(as to EVELIN JIMENEZ)

15.   On or about the date set forth below, in the
Southern District of New York and elsewhere, EVELIN JIMENEZ, the
defendant, willfully and knowingly did make and subscribe to a
U.S. Individual Income Tax Return, Form 1040, for the tax year set
forth below, which return contained and was verified by the written
declaration of EVELIN JIMENEZ that it was made under penalties of
perjury, and which return EVELIN JIMENEZ did not believe to be
true and correct as to every material matter, in that EVELIN
JIMENEZ falsely stated that she had at least one dependent for
whom she could claim a tax credit, whereas, as EVELIN JIMENEZ then
and there well knew, she did not have the listed dependent, as
detailed below:

| Count | Tax Year | Approximate Filing Date of Return | Initials of Dependent |
|-------|----------|-----------------------------------|-----------------------|
| Sixteen | 2012 | March 4, 2013 | P.R.M. |

(Title 26, United States Code, Section 7206(1).)

7

The bases for my knowledge and for the foregoing charges are, in part, as follows:

16.   I have been a Special Agent with IRS-CI for approximately nine years.   Before serving as a Special Agent, I worked as a Revenue Officer with the IRS for approximately fourteen years.   Through my training and experience, I have become familiar with the manner in which federal individual income tax returns ("tax returns" or "returns") are prepared and filed, common deductions or credits that individual taxpayers may claim on returns, various schemes in which individuals may fraudulently seek to increase the refunds paid to them by the United States Treasury, and the indicia that a tax return or set of tax returns may have been prepared as part of such a scheme.   As a Special Agent, I have, among other things, participated in surveillance, the introduction of undercover agents, debriefings of cooperating witnesses, interviews, and the execution of search warrants, including search warrants involving electronic evidence.

17.   I have participated in the investigation of this matter, and I am familiar with the information contained in this affidavit based on my own personal participation in the investigation, my review of documents and conversations that I have had with other law enforcement officers and other individuals. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.   Where the contents of documents, and the actions and statements of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## SUMMARY OF THE SCHEME

18.   As described more fully herein, the investigation by IRS-CI has revealed that the defendants engaged in large-scale identity theft and tax fraud schemes through which (a) identifying information of minors, including names, dates of birth, and SSNs, was obtained, including through payments to a corrupt New York City employee, and (b) the identifying information was then used to file thousands of fraudulent tax returns, resulting in millions of dollars in estimated loss to the United States Treasury.   In sum, through tax preparation businesses based at multiple locations within the Bronx, New York, the defendants, assisted by co-conspirators, charged individual taxpayers a cash fee, on top of a tax preparation charge, in return for which the business would prepare and file tax returns that falsely claimed that the individual taxpayer had one or more minor dependents, to take

fraudulent advantage of at least one tax credit, thereby inflating the refund paid to the taxpayer.

19. As described more fully below, one tax preparation business was principally operated by ARIEL JIMENEZ, a/k/a "Melo" ("JIMENEZ"), the defendant, along with his wife, IRELINE NUNEZ, the defendant, and sisters, EVELIN JIMENEZ and ANA YESSENIA JIMENEZ, the defendants. The tax preparation business was located in the Bronx. LEYVI CASTILLO, CINTHIA FEDERO, GUILLERMO ARIAS MONCION, MARCOS DE JESUS PANTALEON, a/k/a "Junior," and JOSE CASTILLO, a/k/a "Jairo," the defendants, were employees of the business. This tax preparation business is referred to herein as the "Jimenez Tax Business."

20. As described more fully below, in or about 2013, GUILLERMO ARIAS MONCION, MARCOS DE JESUS PANTALEON, a/k/a "Junior," and JOSE CASTILLO, a/k/a "Jairo," the defendants, and others known and unknown, broke off from the Jimenez Tax Business and founded their own, similar tax business, named I-Tax & Multiservices LLC in the Bronx (the "I-Tax Business").

21. In or about October 2014, JOSE CASTILLO, a/k/a "Jairo," the defendant, broke off from the I-Tax Business and founded his own, similar tax business, named Jimcast Multi Services Corporation in the Bronx (the "Jimcast Business").

22. In addition, EVELIN JIMENEZ, CINTHIA FEDERO, LEYVI CASTILLO, GUILLERMO ARIAS MONCION, and JOSE CASTILLO, a/k/a "Jairo," the defendants, each filed tax returns that claimed false dependents on their own personal returns.

BACKGROUND

23. Based on my training and experience, my review of IRS documents, and my conversations with others in the IRS, I have learned, in substance and in part, the following:

a. Under federal law, individual taxpayers (or married taxpayers filing jointly) may be entitled to claim certain tax credits. There are a number of such credits, including credits for education and other activities. In order to qualify for such credits, the taxpayer must have engaged in certain conduct and/or incurred certain expenses. A taxpayer must also typically meet certain rules, such as a maximum level of income. Unlike a tax deduction, a tax credit does not reduce the taxable income of a taxpayer. Rather, it operates as a direct credit, and can result in a tax refund when the amount of the credit exceeds the amount

of tax that a taxpayer would otherwise owe.  The resulting refund can be thousands of dollars.

b.     One tax credit available to certain taxpayers is the EITC.  The EITC is a refundable federal income tax credit for low to moderate income working individuals and families.  When the EITC exceeds the amount of taxes owed by an individual, it results in a tax refund, paid out of the United States Treasury, to those who claim and qualify for the credit.  To qualify for the EITC, an individual must have earned income from employment, self-employment or another source and meet certain rules—that is, a person must have earned income that would otherwise be subject to taxation.  The individual must also either meet the additional rules for workers without a qualifying child or have a child that meets all the qualifying child rules (in general terms, a child who is a dependent of the taxpayer).  If the individual claims the EITC based on having a qualifying child, the individual must list the name and SSN of the child on his or her tax return, along with completing a separate schedule that contains the child's name, SSN, year of birth, relationship to the taxpayer, and how many months the child lived with the taxpayer during the tax year.

c.     The EITC can result in a taxpayer receiving a refund of thousands of dollars when he or she would otherwise receive a much smaller refund, or no refund.

d.     There are various ways in which a taxpayer may have a tax return prepared and then submitted to the IRS.  One such way is for the individual taxpayer to seek the assistance of a tax preparation business.  Typically, such businesses charge a flat fee for the service of preparing and submitting the return.  The submission may be and often is done electronically.

e.     In order for a tax preparer to submit a return electronically, it generally must have two sets of identifying numbers — an Electronic Filing Identification Number ("EFIN") and a Preparer Tax Identification Number ("PTIN").  An EFIN is a number issued by the IRS to individuals or firms that have been approved as authorized IRS "e-file" providers.  It is included with all electronic return data transmitted to the IRS.  A PTIN is a number issued by the IRS to paid tax return preparers.  It is used as the tax return preparer's identification number and, when applicable, must be placed in the "Paid Preparer" section of a tax return that the tax return preparer prepared for compensation.

f.     To receive an EFIN, an individual must submit an application to the IRS containing, among other things, the

applicant's SSN or employer identification number ("EIN"), the business name (if any), and the business address (not the applicant's personal address). If the applicant is not a certified public accountant, an attorney, or an enrolled agent, the application must also include the applicant's fingerprints.

g. An EFIN is not permitted to be transferred from one provider to another.

h. By reviewing the returns filed under a particular EFIN or PTIN, one can determine whether returns filed by a particular tax preparation business or individual tax preparer follow a discernible pattern, including a pattern that may be indicative of fraud. For example, if a very high percentage of returns result in a refund (particularly a refund of thousands of dollars), that may indicate that at least some returns contain deductions or credits to which the taxpayer is not entitled. This is so because, at the end of a given tax year, some taxpayers are owed large refunds, some are owed small refunds, and some are not owed refunds at all. In reviewing returns submitted by a tax preparation business that prepared a meaningful volume of returns, one would expect to see refund rates that are in line with the overall averages.

### SUMMARY OF INFORMATION FROM COOPERATING WITNESSES

24. From my participation in the investigation and my conversations with other law enforcement officers, I have learned that, in or about March 2013, a cooperating witness ("CW-1") engaged in several proffer sessions with law enforcement.[1] During these proffer sessions, CW-1 informed law enforcement, in substance and in part, of the following:

a. CW-1 worked as a fraud investigator with the New York City Human Resources Administration ("HRA") from in or about July 1996 until in or about May 2013. In that capacity, CW-

---

[1] In or about October 2013, CW-1 was arrested and charged in the Southern District of New York with several crimes. CW-1 proffered in hopes of entering into a cooperation agreement with the Government. After these proffer sessions, CW-1 pleaded guilty to multiple offenses pursuant to a cooperation agreement. Thus far, the information provided by CW-1 has been reliable and has been corroborated by other aspects of the investigation.

1 had access to, among other things, minors' names, dates of birth, and SSNs.

b. While working at the HRA, CW-1 obtained children's names and identifying information from the Welfare Management System and sold those names to ARIEL JIMENEZ, a/k/a "Melo," the defendant, so that JIMENEZ could list these children as dependents on tax returns JIMENEZ prepared for JIMENEZ's clients.

25. From my participation in the investigation and my conversations with other law enforcement officers, I have learned that, beginning in or about May 2014, a cooperating witness ("CW-2")[2] engaged in several proffer sessions with law enforcement. During these proffer sessions, CW-2 informed law enforcement, in substance and in part, of the following:

a. In or about early 2008, CW-2 met ARIEL JIMENEZ, a/k/a "Melo," the defendant.[3] Prior to this time, CW-2 had met CW-1 through a mutual acquaintance.[4] CW-2 learned, from CW-2's conversations with JIMENEZ as well as CW-2's own observations, that JIMENEZ owned the Jimenez Tax Business, and CW-2 used the Jimenez Tax Business for the preparation of CW-2's own tax returns for several years beginning in or about early 2008. According to CW-2, JIMENEZ operated the Jimenez Tax Business with IRELINE NUNEZ, EVELIN JIMENEZ, and ANA YESSENIA JIMENEZ, the defendants.

b. It is CW-2's understanding that JIMENEZ used to run the Jimenez Tax Business under the name "Melosky," but that JIMENEZ changed the name after being fined by the State of New York in connection with the Jimenez Tax Business.[5] CW-2 further

---

[2] In or about October 2013, CW-2 was arrested and charged in the Southern District of New York with multiple crimes. CW-2 proffered in hopes of entering into a cooperation agreement with the Government. To date, CW-2 has proffered on numerous occasions in connection with two separate investigations. CW-2 has pleaded guilty to multiple offenses pursuant to a cooperation agreement. Thus far, the information provided by the CW-2 has been reliable and has been corroborated by other aspects of the pertinent investigations.

[3] CW-2 identified JIMENEZ in several photographs.

[4] CW-2 identified CW-1 in a photograph.

[5] I have reviewed a newspaper article from October 2014 indicating

believes from CW-2's conversations with JIMENEZ and CW-2's observations of the locations from which JIMENEZ runs the Jimenez Tax Business, that JIMENEZ has changed the name of the Jimenez Tax Business numerous times in order to avoid trouble with the authorities. In addition to "Melosky," CW-2 believes that JIMENEZ has used the name "I & I" for the Jimenez Tax Business, among other names.

c.      It is CW-2's understanding, from CW-2's own personal observations of the Jimenez Tax Business and conversations that CW-2 had with the individuals working at the Jimenez Tax Business, that many members of JIMENEZ's family, including his wife, two of his sisters, among other individuals, work for the Jimenez Tax Business, at the various locations, under JIMENEZ's direction.[6]  CW-2 identified GUILLERMO ARIAS MONCION, LEYVI CASTILLO, and CINTHIA FEDERO, the defendants, as tax preparers who prepared returns for clients at the Jimenez Tax Business; CW-2 identified JOSE CASTILLO, a/k/a "Jairo," and LEYVI CASTILLO, the defendants, as Jimenez Tax Business employees who brought clients to cash their refund checks at check cashers; CW-2 also identified MONCION, LEYVI CASTILLO, and FEDERO as individuals who recruited clients to the Jimenez Tax Business.

d.      CW-2 began doing odd jobs for JIMENEZ and the Jimenez Tax Business in or about 2008 or 2009.  Among other things, JIMENEZ asked CW-2 to pick up papers from CW-1, and provide them to JIMENEZ.  JIMENEZ further informed CW-2, in sum and substance, that JIMENEZ needed CW-2 to do this because JIMENEZ did not want to have direct contact with CW-1.

e.      The papers that CW-2 picked up from CW-1 to deliver to JIMENEZ consisted of birth certificates and/or lists of numbers.   CW-2 estimates that CW-2 brought papers from CW-1 to JIMENEZ, or one of JIMENEZ's family members working at the Jimenez Tax Business, approximately three times a week during tax season, and that there were approximately fifty to one-hundred papers each time.   CW-2 would deliver the papers to JIMENEZ or one of JIMENEZ's

---

that several individuals who worked at the Jimenez Tax Business, including EVELIN JIMENEZ, ANA YESSENIA JIMENEZ, NUNEZ, and LEYVI CASTILLO were involved in a lawsuit relating to large penalties imposed by the New York State Department of Taxation and Finance in connection with irregularities in the tax returns they prepared in connection with their work at two companies, "Melosky Corp," and "I & I General Services Corp."

[6] CW-2 identified a picture of NUNEZ as JIMENEZ's wife and pictures of EVELIN JIMENEZ and ANA YESSENIA JIMENEZ as JIMENEZ's sisters.

13

family members, including ANA YESSENIA JIMENEZ and EVELIN JIMENEZ. JIMENEZ or another Jimenez Tax Business employee would give CW-2 cash, approximately $4,000 to $10,000, to bring back to CW-1. CW-2 would deliver the money from JIMENEZ to CW-1, and CW-1 would count the money in front of CW-2 and pay CW-2 approximately $200 to $500 for each delivery of papers.

f.     Generally, CW-1 would contact CW-2 when it was time for CW-2 to pick up the papers. CW-2 would meet CW-1 at various locations, including CW-1's house, restaurants, or outside various tax return preparation businesses. CW-2 recalls that CW-2 delivered these papers from CW-1 to JIMENEZ or one of JIMENEZ's family members working at the Jimenez Tax Business, over the course of a number of years, from in or about 2009 until in or about 2012.

g.     During the course of providing the papers from CW-1 to JIMENEZ, through CW-2's own observations and discussions with others, including discussions with JIMENEZ, JIMENEZ's family members who work at the Jimenez Tax Business, and individuals who had their tax returns prepared at the Jimenez Tax Business, CW-2 learned that the Jimenez Tax Business fraudulently adds one or more children to individuals' tax returns in order to obtain refunds. The individuals pay the Jimenez Tax Business approximately $1,500 for each child that is fraudulently added to a tax return, as well as approximately $450 for the preparation of the tax return. CW-2 stated that the fraudulent children who are added to the tax returns are generally referred to as "pollitos," a Spanish word which, I understand, translates to "little chickens" in English.

h.     CW-2 estimates that a significant percentage of the individuals who get their taxes prepared at the Jimenez Tax Business fraudulently add such "pollitos" to their tax returns. In addition, through CW-2's own observations and discussions with others, CW-2 has learned that the Jimenez Tax Business also prepares fraudulent tax returns for certain individuals who receive public assistance and falsify their employment income. It is CW-2's understanding that the Jimenez Tax Business stays open throughout the year because, in addition to preparing individual tax returns during each year's tax season, the Jimenez Tax Business prepares taxes for business entities throughout the year.

i.     Over the years, CW-2 has referred individuals to the Jimenez Tax Business so that those individuals can fraudulently have "pollitos" added to their individual tax returns. For each customer that CW-2 referred to the business, JIMENEZ would pay CW-2 approximately $30 in cash.

14

j. On one occasion during the course of CW-2's involvement with the Jimenez Tax Business, at the request of one of the employees of the tax business, CW-2 went to a check cashing location with an apparent client of the Jimenez Tax Business. There, the client cashed a tax refund check, and CW-2 and the client then returned to the Jimenez Tax Business. There, CW-2 observed the client hand the employee cash, which the employee, in turn, added to other cash and gave to CW-2 to provide to CW-1.

k. On another occasion during the course of CW-2's involvement with the Jimenez Tax Business, EVELIN JIMENEZ, the defendant, told CW-2, in sum and substance, that some of the "pollitos" provided by CW-1 had been rejected because someone had used them already. EVELIN JIMENEZ asked CW-2 to let CW-1 know this had happened, and EVELIN JIMINEZ provided CW-2 with a list of the SSNs that had been rejected to give to CW-1.

l. At some point during the years when CW-2 provided the papers from CW-1 to JIMENEZ and his family members, CW-2 started to secretly photocopy the papers, so as to have evidence of what JIMENEZ and CW-1 were doing in the event that CW-2 was caught as part of the scheme. During the course of CW-2's proffer sessions, CW-2 provided the papers that CW-2 had photocopied to me, through CW-2's attorney. These papers are described below in paragraph 27.

m. In or about March 2013, JIMENEZ asked CW-2 to pick up papers from a woman that CW-2 understood to be JIMENEZ's girlfriend. CW-2 met the woman in the vicinity of Southern Boulevard in the Bronx, and obtained approximately 20 to 25 papers from her. According to CW-2, the papers looked similar to the papers that CW-2 had delivered between CW-1 and JIMENEZ, and CW-2 made copies of the papers before providing them to JIMENEZ.

26. From my participation in the investigation and my conversations with other law enforcement officers, I have learned that, beginning in or about May 2015, a cooperating witness ("CW-3")[7] engaged in several proffer session with law enforcement. During these proffer sessions, CW-3 informed law enforcement, in substance and in part, of the following:

---

[7] CW-3 has pleaded guilty to multiple offenses pursuant to a cooperation agreement with the Government. Thus far, the information provided by CW-3 has been reliable and has been corroborated by other aspects of this investigation.

a.    CW-3 began working at the Jimenez Tax Business in or about 2009 and left the business in or around 2013.

b.    CW-3 worked at the Jimenez Tax Business alongside ARIEL JIMENEZ, a/k/a "Melo," IRELINE NUNEZ, ANA YESSENIA JIMENEZ, EVELIN JIMENEZ, LEYVI CASTILLO, CINTHIA FEDERO, GUILLERMO ARIAS MONCION, MARCOS DE JESUS PANTALEON, a/k/a "Junior," and JOSE CASTILLO, a/k/a "Jairo," the defendants.[8]

c.    CW-3 prepared taxes one year, but mostly performed data entry, adding the information of false dependents to client tax returns, and customer services roles in the Jimenez Tax Business.    JIMENEZ, NUNEZ, ANA YESSENIA JIMENEZ, EVELIN JIMENEZ, LEYVI CASTILLO, FEDERO, and MONCION served as tax preparers.    LEYVI CASTILLO, MONCION, and JOSE CASTILLO would recruit customers to have tax returns prepared containing false dependents at the Jimenez Tax Business and also accompany customers to cash their refund checks and collect the Jimenez Tax Business's fee, see infra ¶ 26(f).    PANTALEON would also assist in accompanying customers to cash their refund checks.    In addition, FEDERO would perform data-entry responsibilities at the Jimenez Tax Business.    Each of these defendants were involved in the preparation of tax returns including false dependents, as is set forth below, see infra ¶¶ 26(d)-(g).

d.    Individuals working at the Jimenez Tax Business would use lists containing the names and identifying information of minors ("Minor Lists") to add as false dependents to tax returns prepared by the Jimenez Tax Business.    Jimenez Tax Business employees would refer to these minors as "pollitos."    The Jimenez Tax Business would charge clients approximately $1,000 to $1,500 per false dependent in addition to an approximately $400 return preparation fee.    The clients' tax refunds would be used to pay these fees.

e.    For much of the period CW-3 worked at the Jimenez Tax Business, NUNEZ, ANA YESSENIA JIMENEZ, and EVELIN JIMENEZ controlled the Minor Lists.    CW-3 would be given a Minor List and partially prepared tax returns marked with either the number <1> or <2>.    CW-3 would then use the Minor Lists to add either one or two dependents to the tax returns, depending on the number marked on the return.

f.    When Jimenez Tax Business clients received their tax refund checks, CW-3 or another Jimenez Tax Business

---

[8] CW-3 identified photographs of these defendants.

employee would accompany the client to a check casher.  The Jimenez Tax Business employee would obtain the share of the refund check specified as the Jimenez Tax Business fee and return that fee to the Business, giving it to the employee who had prepared the corresponding tax return.  CW-3 most often presented these fees to NUNEZ, ANA YESSENIA JIMENEZ, and EVELIN JIMENEZ.

> g.    In or about Fall 2013, CW-3, MONCION, and PANTALEON, and JOSE CASTILLO left the Jimenez Tax Business to start the I-Tax Business.  Before leaving the Jimenez Tax Business, JOSE CASTILLO took several Minor Lists to use at the I-Tax Business. The I-Tax Business operated similarly to the Jimenez Tax Business, preparing tax returns for clients and including false dependents in order to claim the EITC and obtain a fraudulent refund.   The I-Tax Business would charge clients between $1,000 and $1,400 per false dependent in addition to a $300 fee for preparing the return. The clients' tax refunds would be used to pay these fees.

> h.    In or about October 2014, JOSE CASTILLO left the I-Tax Business to start the Jimcast Business.

27.    I have reviewed copies of the papers provided to me by CW-2, as described above.   These documents consist generally of lists of minors and their identifying information (names, dates of birth, and SSNs), as well as copies of birth certificates and social security cards.   Some of the documents appear to have a facsimile header indicating that the documents were faxed from a number beginning with "212" at "HRA," which I believe, based on my involvement with this investigation, likely stands for the New York City Human Resources Administration, CW-1's former employer. I further compared a sampling of the papers to IRS records, and determined that some of the minors listed on the papers were used on tax returns filed by the Jimenez Tax Business for the tax years 2010 and 2011.  Based on information provided by CW-3, *see supra* ¶¶ 26(d)-(e), I believe that these papers reflect the Minor Lists used by CW-3 and other employees of the Jimenez Tax Business and the I-Tax Business.

### SUMMARY OF CERTAIN RECORDS WITH RESPECT TO THE BUSINESSES

28.    I have reviewed records, including records from the New York State Secretary of State, indicating that ARIEL JIMENEZ, a/k/a "Melo," the defendant, and his associates have conducted business under the following business names since in or about 2010: "Melosky Corp.," "JIMFA Inc.," "I & I General Services Corp.," "JIMFA Co.," and "JIMFA Help & Resolution Center LLC."

29.     Based on my review of New York State Secretary of State records, I have learned the following:

a.     The articles of incorporation for the business "Melosky Corp." were filed on or about April 5, 2010.

b.     The articles of incorporation for the business "I & I General Services Corp." were filed on or about April 19, 2010.

c.     The articles of incorporation for the business "JIMFA Inc." were filed on or about April 19, 2010.

d.     The articles of organization for the business "JIMFA Help & Resolution Center LLC" were filed on or about December 30, 2013.

e.     The articles of organization for the business "I-Tax Multiservices LLC" were filed on or about October 10, 2013.

f.     The articles of incorporation for the business "JIMCAST Multi Services Corp." were filed on or about August 4, 2014.

30.     Based on my involvement in this investigation, I know that the Jimenez Tax Business most recently operated from a particular address in the Bronx, New York, referred to herein as the "Jimenez Tax Business Address."

31.     I have reviewed bank records from TD Bank for the business "JIMFA Help & Resolution Center LLC" with a listed address of the Jimenéz Tax Business Address.     ARIEL JIMENEZ, the defendant, is listed on the records as the President of JIMFA Help & Resolution Center LLC.     From my review of the records I have learned the following:

a.     The accounts for JIMFA Help & Resolution Center LLC were opened in or about January 2014.     There were numerous checks deposited into the accounts that indicate, in the memo line, that they were provided for taxes or tax preparation fees.     In addition, there are electronic transfers into one of the accounts, ending in "0191," of over $800,000 that appear to be from a third-party processor (a company that provides filing services, including electronic filing, and refund disbursement). I believe that these funds are return preparation fees, automatically deducted from a taxpayer's refund and paid to the 0191 Account on behalf of JIMFA Help & Resolution Center LLC.

18

b.      There are withdrawals from another account, ending in "0216," that appear to be for the rent for the Jimenez Tax Business Address for the period of January to February 2014, and other withdrawals from this account that appear to be payroll payments.

c.      There are checks written from another account, ending in "0224," with memo lines referencing "phone," "office supplies," "advertisement," "IT network," "garbage," and "rent."

d.      There are checks written from another account, ending in "0208," with memo lines referencing "Melosky telephone," and what appears to be the rent for the Jimenez Tax Business Address for the months of April, May, and June 2014.

32.     I have reviewed bank records for an account for the business "MELOSKY," which was opened in or about May 2010.  ARIEL JIMENEZ, a/k/a "Melo," and EVELIN JIMENEZ, the defendants, are listed on the records as the account holders.  From my review of the records I have learned that there were numerous checks deposited into the account which indicate, in the memo line, that they were provided for taxes or tax preparation fees.

### SUMMARY OF RECORDS OBTAINED FROM THE BUSINESSES AND RELATED INDIVIDUALS

33.     Based on my conversations with law enforcement officers from the New York City Department of Investigation ("DOI"), the DOI searched CW-1's work computer in or about July 2012.  In this search, the DOI found a list of minors' names, dates of birth, and SSNs (the "DOI List").  Based on my review of tax returns filed by the Jimenez Tax Business for tax year 2010, at least some of the minors on the DOI List were claimed, or attempted to be claimed, as dependents of Jimenez Tax Business clients.

34.     Based on my involvement in this investigation, I know that on or about January 8, 2015, a search was conducted of the Jimenez Tax Business at the Jimenez Tax Business address pursuant to a search warrant.  Among other things, this search resulted in the seizure of several birth certificates and corresponding social security cards belonging to minor children.

35.     Based on my involvement in this investigation, I know that on or about May 21, 2015, a search was conducted of the I-Tax Business pursuant to a search warrant.  Among other things, this search recovered birth certificates and corresponding social security cards belonging to minor children.  The search also

19

recovered three envelopes containing cash – two envelopes contained $1,400 each and one contained $1,000. The exterior of each envelope included the name and phone number of an individual. Based on my communications with CW-3, I have learned that the cash within the envelopes reflect the fees paid by the individuals listed on the envelopes for the false dependent that the I-Tax employees claimed on the given individual-client's tax return.

### SUMMARY OF CERTAIN IRS RECORDS

36. Based on my review of IRS and other records, as well as my communications with an IRS analyst I have learned the following, in substance and in part:

a. In or about June 2006, ARIEL JIMENEZ, a/k/a "Melo," the defendant, applied for an EFIN, which he received that same month (the "June 2006 EFIN"). JIMENEZ applied for this EFIN under the business name "Melosky." This EFIN was suspended in May 2009, due to issues relating to complying with IRS rules and regulations related to the EITC.

b. In or about December 2007, IRELINE NUNEZ and EVELIN JIMENEZ, the defendants, applied for an EFIN, which they received in or about January 2008 (the "January 2008 EFIN"). IRELINE NUNEZ and EVELIN JIMENEZ applied for this EFIN under the business name "I & I General Services Corp." The January 2008 EFIN was the EFIN used for the vast majority of the tax returns filed by the Jimenez Tax Business for tax years 2009 through 2013.

c. In or about February 2010, ANA YESSENIA JIMENEZ, the defendant, applied for an EFIN, which she received in or about March 2010 (the "March 2010 EFIN"). ANA YESSENIA JIMENEZ applied for this EFIN under the business name "JIMFA Co." The March 2010 EFIN was used for approximately 13 tax returns filed by the Jimenez Tax Business for tax year 2010.

d. In or about June 2010, NUNEZ and EVELIN JIMENEZ applied for an EFIN, which they received in or about July 2010 (the "July 2010 EFIN"). NUNEZ and EVELIN JIMENEZ applied for this EFIN under the business name "Jimenez Co." There were no returns filed under this EFIN.

e. In or about September 2013, GUILLERMO ARIAS MONCION, the defendant, applied for an EFIN, which he received in or about December 2013 (the "December 2013 EFIN"). MONCION applied for this EFIN under the business name "I-Tax & Multiservices LLC." There were approximately 2,475 returns filed under this EFIN for tax years 2013 and 2016.

f.      In or about September 2014, JOSE CASTILLO, a/k/a "Jairo," the defendant, applied for an EFIN, which he received in or about November 2014 (the "November 2014 EFIN"). CASTILLO applied for this EFIN under the business name "JIMCAST Multi Services Corp." There were approximately 1,520 returns filed under this EFIN for tax year 2014.

g.      In or about November 2014, JIMENEZ applied for an EFIN, but the IRS subsequently revoked the application.

h.      In or about September 2017, the December 2013 EFIN was deactivated by the IRS.  In or about January 2018, MONCION was issued a replacement EFIN (the "January 2018 EFIN").   There were approximately 680 returns filed under this EFIN for tax year 2017.

37.     From my review of IRS records and my review of a summary prepared by an IRS analyst of certain tax returns filed, I further know the following:

a.      For tax year 2009 (that is, in calendar year 2010), the January 2008 EFIN was used to file more than 3,600 federal income tax returns electronically.   Of these returns, approximately 99% claimed a refund, and approximately 60% claimed the EITC.

b.      For tax year 2010 (that is, in calendar year 2011) the January 2008 EFIN and March 2010 EFIN were used to file more than 4,900 federal income tax returns electronically.   Of these returns, approximately 99% claimed a refund, and approximately 57% claimed the EITC.

c.      For tax year 2011 (that is, in calendar year 2012) the January 2008 EFIN was used to file more than 5,500 federal income tax returns electronically.   Of these returns, approximately 99% claimed a refund, and approximately 60% claimed the EITC.

d.      For tax year 2012 (that is, in calendar year 2013) the January 2008 EFIN was used to file more than 4,600 federal income tax returns electronically.   Of these returns, approximately 98% claimed a refund, and approximately 58% claimed the EITC.

e.      For tax year 2013 (that is, in calendar year 2014) the January 2008 EFIN was used to file more than 3,300 federal income tax returns electronically.   Of these returns,

approximately 97% claimed a refund, and approximately 62% claimed the EITC.

f.   For tax year 2013 (that is, in calendar year 2014), the December 2013 EFIN was used to file more than 550 federal income tax returns electronically.   Of those returns, approximately 95% claimed a refund, and approximately 74% claimed the EITC.

g.   For tax year 2014 (that is, in calendar year 2015), the December 2013 EFIN was used to file more than 580 federal income tax returns electronically.   Of those returns, approximately 98% claimed a refund, and approximately 74% claimed the EITC.

h.   For tax year 2014 (that is, in calendar year 2015), the November 2014 EFIN was used to file more than 1,520 federal income tax returns electronically.   Of these returns, approximately 98% claimed a refund, and approximately 56% claimed the EITC.

i.   For tax year 2015 (that is, in calendar year 2016), the December 2013 EFIN was used to file more than 680 federal income tax returns electronically.   Of these returns, approximately 96% claimed a refund, and approximately 72% claimed the EITC.

j.   For tax year 2016 (that is, in calendar year 2017), the December 2013 EFIN was used to file more than 640 federal income tax returns electronically.   Of these returns, approximately 97% claimed a refund, and approximately 70% claimed the EITC.

k.   For tax year 2017 (that is, in calendar year 2015), the January 2018 EFIN was used to file more than 680 federal income tax returns electronically.   Of these returns, approximately 96% claimed a refund, and approximately 70% claimed the EITC.

38.   Based on my training and experience, I have learned, among other things, that the refund and EITC rates discussed above, *see supra* ¶ 37, are high and are consistent with the submission of fraudulent returns.   For example, by reviewing IRS tax returns through the assistance of a data-analysis software, I have learned that between tax years 2010 and 2017, between approximately 34% and 39% of tax returns filed in the Bronx, New York, claimed the EITC.   By conducting the same analysis, I have

22

learned that in the same time period between approximately 18% and 21% of tax returns filed in the United States claimed the EITC.

## REVIEW OF CERTAIN OF THE DEFENDANTS' INDIVIDUAL TAX RETURNS

39. I have reviewed U.S. Individual Income Tax Returns, Forms 1040, for GUILLERMO ARIAS MONCION, the defendant, for tax years 2013 through 2016. In 2013, MONCION included a dependent with the initials "N.R.A." The parents of N.R.A. have confirmed that N.R.A. did not live with MONCION at any time. In 2014, MONCION included a dependent with the initials "D.A." D.A. has confirmed that he/she did not reside with MONCION in 2014 or at any time. In 2015 and 2016, MONCION included dependents with the initials "A.B.U." and "A.B-U." Based on a conversation I had with the mother of A.B.U. and A.B-U., I have learned that the minors are not relatives of MONCION and that MONCION did not have authorization to use the minors' personal information in MONCION's tax filing. Further, based on my participation in an interview of MONCION in or about June 2015, I know that MONCION admitted that the dependents listed on his personal returns for 2013 and 2014 were not his children. These tax forms were filed using the December 2013 EFIN.

40. I have reviewed U.S. Individual Income Tax Returns, Forms 1040, for JOSE CASTILLO, a/k/a "Jairo" the defendant, for tax year 2013. In tax year 2013, CASTILLO included a dependent with the initials "M.H." Based on my participation in an interview of CASTILLO in or about May 2015, I know that CASTILLO admitted that he did not know M.H. and that he claimed he/she as a dependent in order to receive a bigger refund. This tax form was filed using the January 2008 EFIN.

41. I have reviewed U.S. Individual Income Tax Returns, Forms 1040, for LEYVI CASTILLO, the defendant, for tax year 2012. In tax year 2012, CASTILLO included a dependent with the initials "S.C." In an interview, the mother of S.C. confirmed that S.C. is not a relative of CASTILLO and that CASTILLO did not have authorization to use S.C.'s personal information in CASTILLO's tax filing. This tax form was filed using the January 2008 EFIN.

42. I have reviewed U.S. Individual Income Tax Returns, Forms 1040, for CINTHIA FEDERO, the defendant, for tax years 2012 through 2013. In tax years 2012 through 2013, FEDERO included dependents with the initials "M.H.," "E.J.A.," "N.M.R.," and "E.P." In interviews, the parents of these minors confirmed that the minors are not relatives of FEDERO and that FEDERO did not have authorization to use the minors' personal information in

FEDERO's tax filing. These tax forms were filed using the January 2008 EFIN.

43.   I have reviewed U.S. Individual Income Tax Returns, Forms 1040, for EVELIN JIMENEZ, the defendant, for tax year 2012. In tax year 2012, JIMENEZ included a dependent with the initials "P.R.M."   In an interview, the mother of P.R.M. confirmed that P.R.M. is not a relative of JIMENEZ and that JIMENEZ did not have authorization to use P.R.M.'s information in JIMENEZ's tax filing. This tax form was filed using the January 2008 EFIN.

### THE APPROXIMATE AMOUNT CLAIMED IN RETURNS FILED BY THE DEFENDANTS

44.   Based on my review of IRS records, I have learned that between in or about 2009 and the present, the EFINs discussed above were used to file federal tax returns claiming more than $110 million in refunds, including more than $44 million in the EITC.

WHEREFORE, deponent respectfully requests that warrants be issued for the arrest of ARIEL JIMENEZ, a/k/a "Melo," IRELINE NUNEZ, ANA YESSENIA JIMENEZ, EVELIN JIMENEZ, LEYVI CASTILLO, CINTHIA FEDERO, GUILLERMO ARIAS MONCION, MARCOS DE JESUS PANTALEON, a/k/a "Junior," and JOSE CASTILLO, a/k/a "Jairo," the defendants, and that they be arrested and imprisoned, or bailed, as the case may be.

KAREN FLANAGAN
Special Agent
IRS-CI

Sworn to before me this
8th day of November, 2018

THE HONORABLE ROBERT W. LEHRBURGER
United States Magistrate Judge
Southern District of New York