UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---

| UNITED STATES OF AMERICA | |
|---|---|
| v. | 18-Cr-879 (SHS) |
| ARIEL JIMENEZ, | OPINION & ORDER |
| Defendant. | |

SIDNEY H. STEIN, U.S. District Judge.

In late February, after eight days of trial, a jury found defendant Ariel Jimenez guilty of conspiracy to defraud the United States by obtaining the payment of a false claim in violation of 18 U.S.C. § 286 (Count One); conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 (Count Two); aggravated identity theft in violation of 18 U.S.C. § 1028A (Count Three); and money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Count Four). Jimenez now moves for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, or alternatively, for a new trial pursuant to Rule 33.

### I. Background

The indictment against Jimenez arose from a multiyear tax fraud scheme spearheaded by him and involving multiple tax preparation businesses he owned. According to the evidence at trial, Jimenez and his co-conspirators purchased the stolen identities of children (rather piquantly referred to as "pollitos" by Jimenez and his co-defendants) and sold those identities to clients of his various businesses (the "Jimenez Tax Business"), thereby enabling those clients to falsely claim the children as dependents on their tax returns which the Jimenez Tax Business prepared. As a result, the tax payers received valuable tax credits, primarily the Earned Income Tax Credit ("EITC"). In return for each stolen identity, hundreds of clients each paid the Jimenez Tax Business $1,000 or more in fees. Jimenez then invested some of the proceeds in real estate; those transactions form the basis of Jimenez's money laundering conviction.

During Jimenez's trial, the government called numerous witnesses to substantiate the allegations in the indictment, including two cooperating witnesses: Elvy Jimenez, a mid-level employee of the Jimenez Tax Business, and Ireline Nunez, defendant's ex-wife and the mother of three of his children, who helped manage the Jimenez Tax Business from 2009 through 2015. Both witnesses testified to Jimenez's role as both the owner and the primary decisionmaker in the Jimenez Tax Business. (Tr. 170,

1

385.) Nunez testified that Jimenez taught her how to prepare tax returns and introduced her to the false dependent scheme, (Tr. 395), and both cooperating witnesses described taking direction from Jimenez or entering false dependent information into tax returns prepared by him. (Tr. 191–96, 204, 368.)

Jurors also heard the testimony of several clients of the Jimenez Tax Business, who testified to purchasing false dependent information from the business in order to receive the EITC and other tax credits. (Brigido Abreu, Tr. 298–303; Alex Lopez, Tr. 81–82, 84–98; Toni Cansino, Tr. 719–21.) In addition, they heard the testimony of victims of the scheme, whose family members' identities were stolen for use on tax returns prepared by the Jimenez Tax Business. (Adrian Leon, Tr. 66–71; Melany Acatitla, Tr. 281–88; Lei Geng, Tr. 709–16.) Of the approximately 24,000 personal income tax returns prepared by the Jimenez Tax Business between tax years 2009 and 2014, approximately 14,000 applied for the EITC, a figure significantly disproportionate to the percentage of taxpayers in the United States and in the Bronx who sought the credit. (GX 1010, 1021.) In those same years, the Jimenez Tax Business filed returns seeking a total of almost $38,000,000 in EITC claims. (GX 1010.)

With the proceeds of the false dependent scheme Jimenez purchased four buildings in the Bronx for residential, commercial, and rental purposes. To finance these purchases, the government's evidence demonstrated Jimenez's evasive use of "structuring," i.e., depositing sums of less than $10,000 at different times across different bank accounts to avoid spurring the banks to file currency transaction reports in Jimenez's name. (Tr. 796.) In 2016, after law enforcement officers came to one of the Jimenez Tax Business locations as part of an investigation into the business, Jimenez transferred three of the properties to his parents, (GX 1201–03), telling Nunez that he had done so "to protect the building[s] after the government came to the office." (Tr. 583–84.) He later transferred two of the properties to an LLC controlled by him, and in 2018, Jimenez's parents transferred one of the properties to yet a different LLC. (GX 1201–03, Tr. 577.) Even though Jimenez had ostensibly transferred the real property out of his hands, the evidence demonstrated that he continued to exercise control over them. (GX 701–05, 707, 708; 701-T–05-T, 707-T, 708-T.)

## II. Applicable Law

On a Rule 29 motion for a judgment of acquittal made after a verdict has been reached, the evidence at trial must be "viewed in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the government." *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (internal alterations, citations, and quotation marks omitted). Furthermore, "viewing the evidence in the light most favorable to the government means 'crediting every inference that the jury might have

2

drawn in favor of the government.'" *Id.* (quoting *United States v. Temple*, 447 F.3d 130, 136 (2d Cir. 2006)). "The jury may reach its verdict based upon inferences drawn from circumstantial evidence, and the evidence must be viewed in conjunction, not in isolation." *Id.* Pursuant to those requirements, "the Court may enter a judgment of acquittal only if no rational trier of fact could have found the elements of the offense . . . beyond a reasonable doubt." *United States v. Carrano*, 340 F. Supp. 3d 388, 392 (S.D.N.Y. 2018). Put another way, "[a] judgment of acquittal can be entered only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) (internal citations and quotation marks omitted).

As to defendant's Rule 33 motion for a new trial, the court may vacate the judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33. However, this standard is a strict one: the court must have "a real concern that an innocent person may have been convicted," and while the trial court has more discretion to grant a new trial under Rule 33 than to grant a motion for judgment of acquittal under Rule 29, its discretion must be used "sparingly and in the most extraordinary circumstances." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks and citations omitted). Indeed, "motions for a new trial are disfavored in this Circuit." *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995).

### III. Analysis

Jimenez's primary arguments are thus: as to Counts One, Two, and Three, there is insufficient evidence of wrongdoing within the limitations period to support his conviction; and as to Count Four, the evidence was insufficient to support his conviction as a matter of law. In assessing the sufficiency of the evidence to support a criminal conviction, the Court must ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

#### A. *The Conspiracy Charges*

Jimenez's defense to the charges of conspiring to defraud the United States by obtaining the payment of a false claim (Count One) and conspiring to commit wire fraud (Count Two) is his contention that he withdrew from both conspiracies prior to December 12, 2013. If he in fact did so, those charges must be dismissed on the grounds that the indictment – filed on December 12, 2018 – was outside the five-year statute of limitations. *See* 18 U.S.C. § 3282(a).

To withdraw from a conspiracy, a defendant must take "affirmative action, either the making of a clean breast to the authorities, or communication of the abandonment

3

in a manner reasonably calculated to reach co-conspirators." *United States v. Borelli*, 336 F.2d 376, 388 (2d Cir. 1964). "[R]esignation from a criminal enterprise, standing alone, does not constitute withdrawal as a matter of law." *United States v. Berger*, 224 F.3d 107, 118 (2d Cir. 2000). In addition, "the defendant must not take any subsequent steps to promote the conspiracy . . . and must not receive any additional benefits from the conspiracy." *Id.* (citations omitted).

As evidence of his withdrawal, Jimenez relies primarily on 1) a meeting in the summer of 2012 where he ordered employees to burn the lists of "pollitos" that the business maintained and 2) his order to his employees in early 2013 to cease working with the lists. (Tr. 206–07.) However, there is substantial evidence that the scheme continued well beyond 2013. For example, the cooperator Elvy Jimenez testified that "[n]othing changed" (Tr. 207) after Jimenez allegedly instructed his employees to stop working with the lists. And, Ireline Nunez testified numerous times that the false dependent scheme continued through 2015. (E.g., Tr. 697.)

Furthermore, the government offered a great deal of circumstantial evidence to corroborate testimony that Jimenez continued to engage in the false dependent scheme until 2015, well into the limitations period. For instance, Jimenez continued into 2015 to own and work at the Jimenez Tax Business, (E.g. GX 307), which continued to file disproportionately high numbers of tax returns claiming the EITC. (GX 1010–12, 1021.) Jimenez also used profits from the Jimenez Tax Business to finance the property purchases discussed above after 2013. (GX 1025.) In light of these facts, any evidence that Jimenez purportedly withdrew from the conspiracy could certainly be construed by a reasonable juror to be evidence that, far from actually withdrawing from the conspiracy, defendant was simply attempting to obfuscate his role in the conspiracy.

Accordingly, there manifestly was enough evidence presented at trial for a reasonable juror to find Jimenez guilty beyond a reasonable doubt. Any evidence that Jimenez withdrew from the conspiracy is rebutted by evidence that he did not, and there is strong evidence that he continued to benefit from the conspiracy well into 2015. *See Berger*, 224 F.3d at 118. In the face of this evidence, the Court is not concerned that an innocent person may have been convicted here. *See Ferguson*, 246 F.3d at 134.

### B. *The Aggravated Identity Theft Charge*

Jimenez contends that the government presented insufficient evidence of his commission of aggravated identity theft through the purchase of the false dependent information after December 12, 2013. In order to prove the defendant guilty of aggravated identity theft, the government was required to prove 1) that he was guilty of the conspiracy to commit wire fraud, an enumerated felony in 18 U.S.C. § 1028A(c); 2)

4

that he transferred, possessed, or used a means of identification belonging to someone else; 3) that that transfer, possession, or use took place during and in relation to the conspiracy to commit wire fraud; and 4) that the transfer, possession, or use was knowing and without lawful authority. (Tr. 1049–50.)

Jimenez claims that the government's only evidence of this crime following December 2013 was 1) Nunez's testimony that she saw Jimenez pay Leonel Severino—the co-defendant alleged to have sold the false dependent information to the Jimenez Tax Business—in cash, (Tr. 674, 706), and 2) checks made out to Leonel Severino by Jimenez and his co-conspirators. (GX 1313.) According to Jimenez, that evidence is "objectively insufficient to sustain the conviction on Count Three." Again, however, defendant cherry-picks favorable evidence and evidentiary inferences at the expense of more damaging evidence which supports his conviction that the jury was certainly entitled to credit. For example, there was evidence that the Jimenez Tax Business continued to use false dependent information on tax returns for tax year 2013, which were prepared in 2014. (GX 613.) And Ireline Nunez testified that Jimenez continued to be involved in the false dependent scheme until 2015, including witnessing Jimenez pay Lionel Severino for the lists, (Tr. 706), sell the false dependent information to clients, and collect fees for the false dependent information. (Tr. 693–94.)

There was also evidence at trial that Jimenez aided and abetted his employees in committing aggravated identity theft, and the Court instructed the jury as to aiding and abetting liability. (Tr. 1057–59.) The trial evidence overwhelmingly showed that Jimenez provided his employees with access to the false dependent information, directed them to file tax returns using that information, and profited from client payments for the false dependent information at least through 2015. The jury could have convicted Jimenez on the basis of aiding and abetting liability alone, and there was certainly enough evidence to convince the jury of his guilt on this charge beyond a reasonable doubt.

C. *The Money Laundering Charge*

Finally, as to the money laundering charge, Jimenez claims that the evidence was insufficient as a matter of law. To find the defendant guilty under Count Four (18 U.S.C. § 1956(a)(1)(B)(i)), the jury was instructed that it need find beyond a reasonable doubt that 1) the defendant conducted or attempted to conduct a financial transaction involving property constituting the proceeds of a specified unlawful activity; 2) the defendant knew the property represented the proceeds of unlawful activity; and 3) the defendant knew that the intended aim of the financial transaction was to conceal the nature, location, source, ownership, or control of the proceeds. (Tr. 1054.) "Section 1956 requires only that the transaction be designed to conceal or disguise *one* of the specified

5

attributes of the proceeds, not *all* attributes." *United States v. Crozier*, 640 F. App'x 100, 104 (2d Cir. 2016).

Jimenez does not contest that he knew the properties at issue were purchased with the proceeds of unlawful activity, but contends that the real estate transfers forming the basis of the money laundering charge were insufficiently concealed to constitute money laundering. He contends that, by conducting the transactions in his own name or in the name of LLCs openly controlled by him, the transfers of the properties were "open and notorious." *Id.* (quoting *United States v. Stephenson*, 183 F.3d 110, 121 (2d Cir. 1999)). In Jimenez's view, because "there was no deceptive conduct that drew any connection between the illicit profits of the tax business and the later deed transfers," *id.* at 12, the government failed to show that the intended aim of the financial transactions was to conceal the use of unlawful proceeds. Indeed, he suggests, however implausibly, that the transfers were made "for reasons *other* than to conceal the source of proceeds used to purchase the properties in his own name years prior." *Id.* at 13.

While the defendant may be right that the manner in which he conducted the property transfers did not conceal the *source* of the unlawful proceeds, a reasonable juror was entitled to conclude that the transfers were intended to conceal the *ownership* or *control* of the properties. *See* 18 U.S.C. § 1956(a)(1)(B)(i); *Crozier*, 640 F. App'x at 104. Nunez testified that Jimenez told her he transferred three of the properties because he "wanted to protect the building[s] after the government came to the office." (Tr. 584.) He also wrote Nunez a letter explaining that he had transferred the fourth property to his dad both because "[his dad] had good credit" and because of "when the trouble with the state started." (GX 708-T at 2; Tr. 599.) Furthermore, evidence of bank records and letters from the defendant to Nunez after the transfers demonstrated his continuing control over the properties. (GX 1359; 701-T– 703-T, 707-T, 708-T.)

A reasonable juror could have concluded beyond a reasonable doubt that Jimenez was guilty of Count Four even though some of the transfers were in his name. In *United States v. Odiase*, the defendant was convicted of money laundering after illicitly obtained funds were deposited into her account, and she transferred that sum to an account at a different bank that was also in her name. 312 F. Supp. 3d 432, 433 (S.D.N.Y. 2018). Odiase, like Jimenez, contested that the transfer was designed to conceal "because both accounts were in her own name." *Id.* at 436. This Court found that "[t]he jury was entitled to find otherwise," and "[t]hat Odiase might have been more cunning in her efforts to conceal the source of the funds—perhaps by putting the funds into an account with someone else's name—does not preclude such a finding." *Id.* This Court denied her motion for a new trial, and the United States Court of Appeals

6

for the Second Circuit affirmed, finding that "[t]he evidence presented at trial was sufficient to show Odiase's . . . knowledge that the financial transaction she engaged in was for the purposes of concealing the disguised funds." 788 F. App'x 760, 762 (2d Cir. 2019).

In light of the evidence adduced at trial, the jury was certainly entitled to find Jimenez guilty of money laundering beyond a reasonable doubt.

### IV. Conclusion

Having considered the totality of the evidence presented to the jury and viewing it in the light most favorable to the government, as is required, Jimenez's Rule 29 motion is denied. Moreover, Jimenez's request for a new trial pursuant to Rule 33 is denied because the interests of justice do not require a new trial and the Court has no real concern that an innocent person has been convicted. Accordingly, Jimenez's motion is denied in its entirety.

Dated: New York, New York
April 28, 2022

SO ORDERED:

*[signature]*

Sidney H. Stein, U.S.D.J.